CHRISTINA A. JUMP (D.C. ID No. TX151)
        cjump@clcma.org
CHARLES D. SWIFT (D.C. ID No. 987353)
        cswift@clcma.org
LEILA E. MUSTAFA (D.C. ID No. TX0169)
        lmustafa@clcma.org
Constitutional Law Center for Muslims in America
833 E. Arapaho Rd., Ste. 102
Richardson, TX 75081
Tel: (972) 914-2507; Fax: (972) 692-7454

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MOHAMED AL SERAJI**, AN INDIVIDUAL,
168 N MULLER ST # 103 ANAHEIM, CA 92801

*Plaintiff*,

vs.

**KEVIN MCALEENAN**, IN HIS OFFICIAL
CAPACITY AS ACTING SECRETARY OF THE
DEPARTMENT OF HOMELAND SECURITY,
WASHINGTON, DC 20528;

**WILLIAM BARR**, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
THE UNITED STATES OF AMERICA, 950
PENNSYLVANIA AVE, NW WASHINGTON,
DC 20530;

**DAVID PEKOSKE**, IN HIS OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE
TRANSPORTATION SECURITY
ADMINISTRATION, 601 12TH ST. S,
ARLINGTON, VA 20598;

Civil Case No.:   1:19-cv-2839

**PLAINTIFF'S ORIGINAL COMPLAINT
FOR DAMAGES, DECLARATORY
RELIEF, AND INJUNCTIVE RELIEF**

**CHRISTOPHER WRAY**, IN HIS OFFICIAL
CAPACITY AS DIRECTOR OF THE FEDERAL
BUREAU OF INVESTIGATION, 935
PENNSYLVANIA AVE, NW WASHINGON, DC
20535;

**CHARLES KABLE**, IN HIS OFFICIAL
CAPACITY AS DIRECTOR OF THE
TERRORIST SCREENING CENTER, 935
PENNSYLVANIA AVE, NW WASHINGON, DC
20535 (FBI HEADQUARTERS ADDRESS);

**NICHOLAS VICENCIA**, AN INDIVIDUAL,
935 PENNSYLVANIA AVE, 11000 WILSHIRE
BLVD, SUITE 1700, LOS ANGELES, CA 90024
(FBI LOS ANGELES FIELD OFFICE
ADDRESS),

*Defendants.*

## PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

### I.    INTRODUCTION

1.     Plaintiff Mohamed Al Seraji brings this suit challenging the sufficiency and application of regulations promulgated by the Transportation Security Administration ("TSA") as to the process for administratively challenging the denial of applications for Transportation Worker Identification Credentials (hereinafter "TWIC cards") based on a determination that an applicant is a security threat. That security threat determination and the related administrative process which plaintiffs must take lack adequate due process protections.   Plaintiff now seeks declaratory judgment, injunctive relief, and damages against the Defendants based on the Fifth Amendment of the United States Constitution, due to the failure to afford Plaintiff his procedural and substantive due process rights; failure to abide by the Administrative Procedure Act ("APA"); and a violation of Plaintiff's contractual rights under 42 U.S.C. § 1981.

1

2.      Plaintiff waives his right to a jury trial.

## II.      VENUE AND JURISDICTION

3.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 (2012) and 5 U.S.C. § 702. The Court also has the authority pursuant to 28 U.S.C. §§ 2201 and 2202.  Furthermore, jurisdiction is proper in this Court because Plaintiff brings systemic challenges to the regulations at issue and constitutional claims.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1), which states in relevant part that "a civil action in which a defendant is an officer or employee of the United States or agency thereof acting in his official capacity […] may […] be brought in any judicial district in which […] a Defendant in the action resides."

## III.      PARTIES

5.      Plaintiff Mohamed Al Seraji is a Muslim American citizen of Yemeni national origin residing in Anaheim, California.

6.      Defendant Kevin McAleenan is the Acting Secretary of the Department of Homeland Security ("DHS"). The Administrator of the Transportation Security Administration ("TSA") and the Commandant of the U.S. Coast Guard ("Coast Guard") report directly to him.

7.      Defendant William Barr is the Attorney General of the United States. The U.S. Attorney General oversees the Department of Justice. The Director of the Federal Bureau of Investigation ("FBI") reports directly to him.

8.      Defendant David Pekoske is the Administrator of the TSA.

9.      Defendant Christopher Wray is the Director of the FBI. The Director of the Terrorist Screening Center reports directly to him.

10.     Defendant Charles Kable is the Director of the TSC.

11.     Defendant Nicholas Vicencia is an FBI agent located at the FBI's Los Angeles Office.

12.     Defendants McAleenan, Barr, Pekoske, Wray and Kable are sued in their official capacities.  These Defendants will sometimes be referred to collectively as the "official capacity Defendants" herein.

13.     Defendant Vicencia is sued in his individual capacity.

## IV.     FACTUAL ALLEGATIONS

### A.     Relevant Background

14.     Plaintiff is a naturalized U.S. citizen of Yemeni national origin.

15.     At age 13, Plaintiff came to the United States with a green card obtained through his father.

16.     Plaintiff became a U.S. citizen in 2009.

17.     At the age of 18, Plaintiff enrolled in a local community college, which he attended for three semesters until he had to drop out to take care of his family.

18.     In 2014, Plaintiff's father died, leaving him as the primary caretaker of and support for his mother and three younger siblings.

19.     Plaintiff worked to support his family as an Uber driver while attending college until he had to drop out of college and look for a full-time job, due to his primary caretaking role.

20.     Plaintiff became a truck driver and attended the Toro School of Truck Driving.

21.     On September 9, 2015, Plaintiff successfully completed a Federal Motor Entry Level Class A Professional Tractor Trailer Driver Training Course.

22.     On September 29, 2015, Plaintiff obtained a Commercial Driver's License (hereinafter "CDL") issued by the state of California.

23.     After he obtained his CDL, a shipping company offered Plaintiff a job as a truck driver.

24.     This job offer was conditioned on the requirement that Plaintiff obtain a TWIC card from

the TSA.

25.     In October 2015, Plaintiff sent a TWIC card application to the TSA.

**B.     Encounters with Agent Vicencia**

26.     On October 30, 2015, Mr. Wesley Williams, a TSA representative, left Plaintiff a voicemail informing him that he needed to come in for an interview.

27.     On its website, the TSA lists a three step procedure to get a TWIC card.[1]

28.     The standard procedure does not require a formal interview with the TSA or any other governmental authority per the regulations, which provide that "an applicant must supply the information required in this section, in a form acceptable to [the] TSA, when applying to obtain or renew a TWIC [card]."[2]

29.     TSA representative Williams' call was a deviation from the TSA's published three-step procedure for TWIC applications.

30.     Plaintiff was not informed by Williams that an FBI agent would be present in this meeting, or that he would be asked questions that had no relation to his TWIC card application.

31.     When Plaintiff arrived, he was surprised by the presence of FBI Agent Nicholas Vicencia, who identified himself as "Nick" and showed his FBI badge to Plaintiff.

32.     TSA representative Williams was also present during the interview.

33.     The interview with Agent Vicencia and Williams began with general questions about where Plaintiff lived, studied, and how he immigrated to the United States.

34.     FBI Agent Vicencia began questioning Plaintiff on whether he had been sent by someone

---

[1] *See TWIC*, Transportation Security Administration, https://www.tsa.gov/for-industry/twic (last visited September 13, 2019).

[2] 49 C.F.R. § 1572.17.

4

in Yemen to work in American ports.

35.     Plaintiff responded that he came to the United States as a child, and has not returned to Yemen since.

36.     FBI Agent Vicencia then questioned Plaintiff about whether he had any affiliations with terrorist organizations.

37.     Plaintiff answered that he is not a member of any terrorist organization, nor is any member of his family.

38.     FBI Agent Vicencia then asked if any of Plaintiff's friends were members of terrorist groups.

39.     Plaintiff responded truthfully that he had an acquaintance from the local mosque, Mohanad Badawi, whom Plaintiff learned from the news had at that time been recently arrested.

40.     FBI Agent Vicencia asked whether Plaintiff and Badawi have discussed terrorism.

41.     Plaintiff responded "no," and clarified that he had merely had a handful of brief conversations with Badawi at the mosque.

42.     FBI Agent Vicencia asked Plaintiff to provide usernames for all his social media accounts, and Plaintiff complied (despite this request being outside the realm of the TSA investigation, or standard procedure for a TWIC card applicant).

43.     FBI Agent Vicencia ended the meeting by telling Plaintiff that he should expect a decision with regard to his TWIC card soon, despite the fact that the TSA, not the FBI, is the agency with the authority to issue a TWIC card.

44.     FBI Agent Vicencia further stated, in concluding the meeting, that if the FBI had any questions in the future, it would contact Plaintiff.

45.     None of the questions or the information requested by Agent Vicencia relates to the stated

procedure set forth in the regulations for obtaining a TWIC card.[3]

46.     On December 8, 2015, Plaintiff received an Initial Determination of Threat Assessment, which is a letter from the TSA denying his application for a TWIC card.

47.     Due to the denial of his TWIC card application, Plaintiff was unable to accept the contingent job offer.

48.     The letter from the TSA stated that he was denied the TWIC card because the TSA decided that he was a security threat under 49 C.F.R. § 1572.107(a).

49.     This regulation provides that the TSA may determine that an applicant poses a security threat based on a search of the following databases: "(1) Interpol and other international databases, as appropriate, (2) Terrorist Watchlists and related databases, (3) any other databases relevant to determining whether an applicant poses, or is suspected of posing, a security threat, or that confirm an applicant's identity."[4]

50.     The Initial Determination of Threat Assessment did not provide a specification as to which part of the statutory provision, § 1572.107(a), applied to Plaintiff.

51.     Plaintiff has no criminal record.

52.     Plaintiff has never been involved in or affiliated with any terrorist related activities or organizations.

53.     Shortly after Plaintiff's TWIC card application was denied, Plaintiff received a phone call from FBI Agent Vicencia.

54.     At that time, Agent Vicencia told Plaintiff that he was outside of Plaintiff's house and wanted to come in and get to know Plaintiff better.

---

[3] *See* 49 C.F.R. § 1572.17.
[4] 49 C.F.R. § 1572.107(a).

55.     FBI Agent Vicencia then stated that he was aware that Plaintiff had been denied a TWIC card, and that he could assist Plaintiff in getting his TWIC card.

56.     Plaintiff told FBI Agent Vicencia that he would not speak to him without the presence of his lawyer.

57.     Plaintiff provided FBI Agent Vicencia with the contact information for Todd Gallinger, his attorney at the time.

58.     Later the same day, FBI Agent Vicencia called Plaintiff again and told Plaintiff that he called Mr. Gallinger but Mr. Gallinger did not answer.

59.     FBI Agent Vicencia also stated that Mr. Gallinger was a "bad lawyer" and Plaintiff should hire a new one.

60.     Mr. Gallinger is an attorney in good standing with the State Bar of California.

61.     Despite the input from FBI Agent Vicencia, Plaintiff continued to insist that his attorney at that time, Mr. Gallinger, be present for future discussions.

62.     Mr. Gallinger called FBI Agent Vicencia to schedule a meeting.

63.     During the phone call with Mr. Gallinger, Agent Vicencia again mentioned the FBI's ability to assist Plaintiff in obtaining a TWIC card, and emphasized that he wanted to talk to Plaintiff about Mohanad Badawi (whom Plaintiff acknowledged as an acquaintance during his first meeting with FBI Agent Vicencia).

64.     During Plaintiff's second meeting with FBI Agent Vicencia, Plaintiff's attorney Mr. Gallinger was present, along with an armed Anaheim police officer, whose presence, upon information and belief, was arranged by Agent Vicencia.

65.     No TSA officials were present during the second meeting.

66.     This meeting was, once again, outside any established procedures set forth in the TSA

regulations for obtaining a TWIC card.

67.     FBI Agent Vicencia again questioned Plaintiff about Badawi at this second meeting.

68.     Plaintiff reiterated that he only knew Badawi as an acquaintance.

69.     FBI Agent Vicencia suggested that what Plaintiff said was not true and that Badawi had mentioned Plaintiff to the FBI.

70.     FBI Agent Vicencia further implied that he knew Plaintiff was interested in going overseas to join a terrorist group, which was not true.

71.     Plaintiff denied the unfounded allegations, and reiterated that he had only a few casual conversations with Badawi about topics such as Uber driving, work, and school.

72.     FBI Agent Vicencia pulled out pictures on which Plaintiff had clicked "like" on Facebook, including one of his cousin in Yemen holding a gun.

73.     FBI Agent Vicencia asked Plaintiff why he clicked "like" on this picture.

74.     Plaintiff answered that he clicked "like" on the picture because his cousin was in it.

75.     FBI Agent Vicencia did not identify any purported problems with these pictures or any relevance they had to Plaintiff's TWIC card application.

76.     Nonetheless, FBI Agent Vicencia repeatedly mentioned the TWIC card and his ability to assist Plaintiff with obtaining it.

77.     FBI Agent Vicencia then changed tactics and said that the FBI knew that, unlike his acquaintance Badawi, Plaintiff just wanted to take care of his family.

78.     FBI Agent Vicencia told Plaintiff that the FBI was aware that Plaintiff's father had passed away, and that Plaintiff had become the primary breadwinner for his family.

79.     FBI Agent Vicencia stated that the FBI would like to "help" Plaintiff with his TWIC card application, and implied he would assist Plaintiff if Plaintiff could assist the FBI.

80. FBI Agent Vicencia further stated that the FBI would like Plaintiff to be the government's "eyes and ears on the ground" to "stop another San Bernardino from happening."

81. In other words, FBI Agent Vicencia asked Plaintiff to be an informant.

82. FBI Agent Vicencia told Plaintiff the FBI was interested in getting information on a specific group of individuals, but FBI Agent Vicencia did not identify these individuals.

83. Plaintiff declined the request to work as an informant.

84. FBI Agent Vicencia ended the meeting abruptly once Plaintiff declined to work as an informant, and told Plaintiff that he would not receive a TWIC card.

85. Upon information and belief, Plaintiff was placed on a Terrorist Watchlist before or during the pendency of his application for a TWIC card.

86. Upon information and belief, Defendant Vicencia provided information concerning the Plaintiff, which in whole or in part served as the basis for Plaintiff's inclusion on the consolidated Terrorist Watchlist.

87. Accordingly, upon information and belief, Defendant Vicencia purposely interfered with Plaintiff's contractual rights for employment, as the placement on a Terrorist Watchlist made him ineligible to obtain a TWIC card and, therefore, resulted in the loss of Plaintiff's job offer.

**C. Procedures Governing Issuance, Revocation, and Denial of "TWIC" Cards**

88. Under the Maritime Transportation Security Act ("MTSA"), originally passed in 2002, the DHS Secretary shall issue a security card to a person who needs access to an area of a vessel or facility designated as a secure area, for purposes of a security plan for the vessel or facility.

89. Pursuant to the statute, this card shall be issued unless the person is disqualified by the criteria set forth in the MTSA.[5]

---

[5] 46 U.S.C. § 70105(a)–(b) (2012).

90.     Congress mandated an appeals process for applicants who are denied access to a secure area under the MTSA, which states that "the Secretary shall establish an appeals process under this section for individuals found to be ineligible for a transportation security card that includes notice and an opportunity for a hearing."[6]

91.     In response to the MTSA, the TSA created a series of regulations regarding access to secure areas.[7]

92.     These regulations establish the procedures and standards for obtaining a TWIC card.[8]

93.     Under these regulations, the TSA is the agency designed to conduct security threat assessments (hereinafter "STAs") of applicants for TWIC cards before they are issued.

94.     This assessment includes fingerprint-based criminal history records checks, an intelligence-related check, and final disposition.

95.     To conduct an intelligence-related check under these regulations, the TSA completes the following procedures: (1) review the applicant information required in 49 C.F.R. 1572.17 ("Applicant Information Required for TWIC Security Threat Assessment"); (2) search domestic and international government databases required to determine if the applicant meets the requirements of 49 C.F.R. 1572.105 ("Immigration Status"), 1572.107 ("Other Analyses"), and 1572.109 ("Mental Capacity"); (3) adjudicate the results in accordance with 49 C.F.R. 1572.103, 1572.105, 1572.107, and 1572.109.[9]

96.     The regulations further provide that the TSA may find that an applicant poses a security threat based on the following databases: "(1) Interpol and other international databases, as

---

[6] 46 U.S.C. § 70105(c)(4) (2012).
[7] *See* 49 C.F.R. § 1572 *et. seq.* (2016).
[8] *Id.*
[9] 49 C.F.R. § 1572.21(c).

appropriate; (2) Terrorist Watchlists and related databases; (3) any other databases relevant to determining whether an applicant poses, or is suspected of posing, a security threat, or that confirm an applicant's identity."[10]

97.    Following the attacks of September 11, 2001, Congress and the President mandated that federal executive departments and agencies share terrorism information with those in the counterterrorism community responsible for national security.[11]

98.    In 2003, the TSA was established as a multi-agency center for coordinating information pertaining to terrorist activity.

99.    The TSC maintains the Terrorist Screening Database ("TSDB"), which contains the government's consolidated Terrorist Watchlist.

100.    The TSA denies TWIC cards based on a finding that individuals are in the TSDB, even though the review process relating to placement on the consolidated Terrorist Watchlist does not include any notification or disclosure to the individual involved, as to either the designation of the individual or the reason for the designation of the individual.

101.    The TSA denies TWIC cards based on a finding that individuals are in the TSDB, even though the review process as to placement of an individual on the consolidated Terrorist Watchlist does not include any judicial oversight or review before the individual is included in the TSDB.

102.    If an applicant fails the TSA's STA, the TSA serves an Initial Determination of Threat Assessment on the applicant.

---

[10] 49 C.F.R. § 1572.107(a).

[11] Homeland Security Presidential Directive—6, Integration and Use of Screening Information to Protect Against Terrorism (Sept. 16, 2003); *see also Latif v. Holder*, 686 F.3d 1122, 1125 (9th Cir. 2012); *Mohamed v. Holder,* No. 11–1924, 2013 U.S. App. LEXIS 26340  (4th Cir. May 28, 2013), on remand, *Mohamed v. Holder*, 995 F. Supp. 2d 520, 525 (E.D. Va. 2014), approved and incorporated by reference, *Mohamed v. Holder,* 2015 WL 4394958 (E.D. Va. July 16, 2015).

103.    The TSA may also serve this determination on the Federal Maritime Security Coordinator, the applicant's employer when the TSA deems it appropriate, and the Coast Guard.

104.    An applicant may administratively appeal an Initial Determination of Threat Assessment if the applicant disputes that he or she poses a security threat.

105.    Upon receiving the Initial Determination of Threat Assessment, the applicant has 60 days to initiate a written appeal and a request for material.

106.    Under its regulations, the TSA then has 60 days to respond.[12] However, the TSA may, by its regulations, grant itself an extension of time for good cause, and the TSA is the sole evaluator of whether there is good cause.  The regulations do not provide any limits as to how many days or how many times the TSA can grant itself an extension, and further do not define the meaning of "good cause" in this context.

107.    The applicant may next serve the TSA with a written reply to the Initial Determination of Threat Assessment within 60 days of service of the Initial Determination, or 60 days after the date of service of TSA's response to the applicant's request for materials.  The reply must include rationale and information on which the applicant disputes the Initial Determination.

108.    Next, "[w]ithin 60 days after [the] TSA receives the applicant's reply, [the] TSA serves a Final Determination of Threat Assessment or a Withdrawal of the Initial Determination as provided in paragraphs (c) or (d) of this section."[13]

109.    The TSA's regulations do not address the issue of damages if the TSA denies an application improperly.

110.    If an applicant receives an adverse Final Determination of Threat Assessment, the applicant

---

[12] 49 C.F.R. § 1515.5(b)(3).
[13] 49 C.F.R § 1515.5(b)(6).

can seek further review within 30 days.

111.    Within 30 days after an applicant receives the Final Determination of Threat Assessment, the applicant may request further review.

112.    The review is conducted by an Administrative Law Judge ("ALJ") who possesses the appropriate security clearance to review classified or otherwise protected information and evidence.

113.    If the applicant fails to seek review within 30 calendar days, the Final Determination of Threat Assessment will become final with respect to the parties.[14]

114.    The applicant may include in the request for review a request for an in-person hearing before the ALJ.[15]

115.    The right to this hearing is not guaranteed, and is at the discretion of the ALJ.

116.    The regulations establish the ALJ's duties as follows:

   (1) Receive information and evidence presented to [the] TSA in the request for a waiver under 49 C.F.R. § 1515.7 or an appeal under 49 C.F.R. §1515.9.

   (2) Consider the following criteria to determine whether a request for an in-person hearing is warranted:

      i.  The credibility of evidence or information submitted in the applicant's request for a waiver; and

      ii. Whether TSA's waiver denial was made in accordance with the governing regulations codified at 49 C.F.R. part 1515 and 49 C.F.R. part 1572.

   (3) Give notice of and hold conferences and hearings;

   (4) Administer oaths and affirmations;

   (5) Examine witnesses;

   (6) Regulate the course of the hearing including granting extensions of time limits; and

---

[14] 49 C.F.R. § 1515.11 (b).
[15] 49 C.F.R. § 1515.11(b)(2).

13

(7) Dispose of procedural motions and requests, and issue a decision.[16]

117.    If the ALJ grants a request for a hearing, it shall begin within 60 calendar days of the date of receipt of the request for hearing. The hearing is a **limited** discovery proceeding, within the discretion of the ALJ.

118.    If applicable and upon request, the TSA will, for the first time at this point, provide to the applicant an unclassified summary of the evidence upon which the denial or Final Determination was based.

119.    The applicant may present his or her case by oral testimony, documentary, or demonstrative evidence, submit rebuttal evidence, and conduct cross-examination, but only as permitted in the discretion of the TSA's designated ALJ.

120.    The Federal Rules of Evidence are not binding in the ALJ proceeding.

121.    The standard of proof in this ALJ proceeding is substantial evidence on the record.

122.     This hearing, if even granted, is the first place in the process set forth by the TSA regulations that provides for even a summary of the basis of the STA to be provided to the applicant, to which the applicant can then provide a limited rebuttal (subject to the discretion of the ALJ).

123.    If the ALJ determines that the applicant poses a security threat, the TSA will issue a Final Order of Threat Assessment to the applicant. If the ALJ determines that the applicant does not pose a security threat, the TSA will issue a Withdrawal of the Final Determination to the applicant, and to the applicant's employer, if applicable.

---

[16] 49 C.F.R. § 1515.11(d).

124.    Either the TSA or the applicant may request that the TSA Final Decision Maker[17] review the ALJ's decision, no later than 30 calendar days after the date of service of the decision of the ALJ. The request may only address whether the decision is supported by substantial evidence on the record. The other party must file a response in 30 days.

125.    The ALJ provides the TSA Final Decision Maker with a certified transcript of the hearing and all unclassified documents and material submitted for the record. The ALJ provides the TSA Final Decision Maker with classified materials previously submitted, but not the applicant.[18]

126.    Under the TSA regulations, no later than 60 calendar days after receipt of the request, or if the other party files a response, 30 calendar days after receipt of the response, or such longer period as may be required, the TSA Final Decision Maker issues an unclassified decision and serves the decision on the parties. The TSA Final Decision Maker may also issue a classified opinion, to only the TSA. The decision of the TSA Final Decision Maker is a final agency order.

127.    If the TSA Final Decision Maker determines that the applicant poses a security threat, the TSA issues a Final Order of Threat Assessment to the applicant. If the TSA Final Decision Maker determines that the applicant does not pose a security threat, the TSA will issue a Withdrawal of the Final Determination to the applicant, and to the applicant's employer if applicable.

128.    Applicants may seek judicial review of a final order of the TSA Final Decision Maker.[19]

129.    Nothing in these regulations grants the TSA Administrative Law Judge, or the TSA Final Decision Maker, the right to remove anyone from the Terrorist Watchlist, or any government

---

[17] "TSA Final Decision Maker" means "the Administrator, acting in the capacity of the decision maker on appeal, or any person to whom the Administrator has delegated the Administrator's decision-making authority.  The TSA Final Decision Maker is the official authorized to issue a final decision and order of the Administrator."  49 C.F.R. § 1515.3.  There is no clear limitation or explanation as to whom the Administrator may choose to be this decision-making authority.
[18] 49 C.F.R. § 1515.11(g)(2).
[19] 49 C.F.R. § 1515.11(h).

watchlist.

130.    In response to these TSA regulations, Congress passed the Coast Guard Authorization Act of 2010, which amended in part the earlier provisions of the MTSA.  Specifically, 46 U.S.C. § 70105 was amended to add the following new provision:

> (p) PROCESSING TIME.—The Secretary shall review an initial transportation security card application and respond to the applicant, as appropriate, including the mailing of an Initial Determination of Threat Assessment letter, within 30 days after receipt of the initial application. The Secretary shall, to the greatest extent practicable, review appeal and waiver requests submitted by a transportation security card applicant, and send a written decision or request for additional information required for the appeal or waiver determination, within 30 days after receipt of the applicant's appeal or waiver written request. For an applicant that is required to submit additional information for an appeal or waiver determination, the Secretary shall send a written decision, to the greatest extent practicable, within 30 days after receipt of all requested information.[20]

131.    In doing so, Congress made clear its intent, to the extent it may have been unclear previously, that applicants for TWIC cards receive timely responses, within 30 days of initial application, as well as within 30 days of receipt of appeals.

132.    The TSA regulations, which unilaterally award the TSA longer time frames, do not supersede Congress' intent.

**D.    Plaintiff's Administrative Proceedings with the TSA**

133.    On February 3, 2016, Plaintiff first initiated the TSA's administrative process to appeal the denial of his TWIC card, pursuant to the TSA regulations, by requesting the Initial Determination of Threat Assessment be withdrawn in accordance with 49 C.F.R. § 1515.9(d).

134.    Plaintiff simultaneously requested all releasable documents utilized by the TSA in making its decision to deny Plaintiff's TWIC card application, pursuant to 49 C.F.R. § 1515.5(b)(2).

135.    To the extent that he could, without knowing any reason for the denial of his TWIC card

---

[20] 46 U.S.C. § 70105(p) (as amended, 2010).

application, Plaintiff included the rationale and information on which he generally disputed the TSA's initial determination that he presented a threat.

136.    The TSA responded to Plaintiff in a letter dated March 10, 2016.

137.    The TSA attached a five-page document, with heavy redactions, containing no useful substantive information or any explanation as to why it considered Plaintiff to be a security threat.

138.    The TSA further did not specify whether it had denied his appeal.

139.    On March 24, 2016, Plaintiff appealed the TSA's decision a second time.

140.    In his March 24, 2016 appeal, along with asking for reconsideration, Plaintiff questioned the legality of the TSA's heavy redactions in the document and asked the TSA to give its legal justification for this practice.

141.    The TSA responded to Plaintiff's second appeal in a letter dated April 14, 2016.

142.    Similar to the TSA's March 10, 2016 letter, the TSA did not substantively respond to Plaintiff's second appeal either, and did not address the question of why it considered Plaintiff to be a security threat.

143.    The April 14, 2016 letter informed Plaintiff that he had 60 days from the date of the TSA's letter to "serve upon [the] TSA an additional written reply to the Initial Notification of Threat Assessment."

144.    On April 20, 2016, Plaintiff replied to the TSA's April 14, 2016 letter, stating that he had already appealed the TWIC card denial, twice.

145.    Pursuant to its regulations, the TSA is required to respond within 60 days after an applicant's reply to the Initial Determination, and the TSA must serve a Final Determination of Threat Assessment or Withdrawal of the Initial Determination with its response.[21]

---

[21] 49 C.F.R. §§ 1515.9(b), 1515.5(b)(6).

146.    The Final Determination of Threat Assessment was not provided until November 17, 2016, well after the 60 days as set forth in the TSA's own regulations and not until after the initiation of an earlier lawsuit by Plaintiff.

147.    On May 17, 2017, after the earlier lawsuit was dismissed without prejudice so that Plaintiff could exhaust all applicable administrative remedies available, the TSA allowed Plaintiff to re-urge his administrative appeal.

148.    On May 24, 2017, Plaintiff re-urged his administrative appeal. In this appeal, Plaintiff once again requested any and all releasable materials.

149.    On December 14, 2017, Plaintiff received a Final Determination Letter regarding his TWIC application and appeal. Once again, he was denied, and received no substantive explanation why.

150.    On December 21, 2017, Plaintiff appealed the Final Determination pursuant to 49 C.F.R. § 1515.11.

151.    Plaintiff simultaneously requested review by an ALJ pursuant to 49 C.F.R. § 1515.11(b), which provides that a determination an applicant cannot hold a TWIC card may be reviewed "by an administrative law judge who possesses the appropriate security clearance necessary to review classified or otherwise protected information and evidence."

152.    Pursuant to the regulations, the ALJ has the authority to "determine whether a request for an in-person hearing is warranted based on two criteria: (i) [t]he credibility of evidence or information submitted in the applicant's request […] and (ii) [w]hether TSA's […] denial was made in accordance with the governing regulations codified at 49 CFR part 1515 and 49 CFR part 1572."

153.    On January 9, 2018, the Honorable Dean Metry, a Coast Guard ALJ, was assigned to preside over Plaintiff's administrative appeal matter described herein.

154.    On February 8, 2018, Plaintiff's counsel and the TSA's representatives participated in a pre-hearing telephone conference, with ALJ Metry presiding.

155.    During the conference, ALJ Metry set deadlines for the submission of discovery requests, witness and exhibit lists, any motions, and a date for the unclassified portion of the bifurcated hearing.

156.    The ALJ did <u>not</u> set a deadline or date for the classified portion hearing relevant to Plaintiff's appeal at that time.

157.    The ALJ did not advise at that time whether Plaintiff, or his counsel, would be allowed to attend the classified portion of the bifurcated hearing at that time.

158.    On February 16, 2018, the TSA provided classified materials and materials designated as Sensitive Security Information ("SSI") to the ALJ, for the ALJ's review on an ex parte, *in camera* basis.

159.    In the February 16, 2018 "Notice of Introduction of Classified Materials and Supplement to Releasable Materials," the TSA stated it is not authorized to disclose classified information to Applicant or Applicant's counsel, pursuant to 49 C.F.R. § 1515.11(e)(1).

160.    49 C.F.R. § 1515.11(e)(1) states in relevant part that "TSA will not disclose to the applicant, or the applicant's counsel, classified information, […]."

161.    The TSA stated that an unclassified summary of classified evidence was previously provided.

162.    The unclassified summary which had been provided consists of one page in its entirety.

163.    The unclassified summary page only provides that two individuals, including Mr. Badawi, were arrested for providing material support to a terrorist organization, and had purportedly referred to Plaintiff's name in their text messages.

164.    The unclassified summary page acknowledges that Plaintiff stated he never spoke to Mr. Badawi, other than at the mosque, and did not know the other individual.

165.    The unclassified summary page acknowledges that Plaintiff strongly denied any support to terrorist organizations or discussion of terrorist activities.

166.    The unclassified summary page describes Plaintiff's social media activity and describes how he recognized a picture of a relative holding a rifle.

167.    The unclassified summary page does not provide Plaintiff with any new information, and in fact all information contained in the unclassified summary was previously contained in Plaintiff's own earlier pleading in a prior lawsuit seeking further action on his TWIC card application.

168.    The TSA provided Plaintiff's undersigned counsel with no other substantive supplemental releasable materials.

169.    Similar to the unclassified summary page, Plaintiff received no new information, and no reasons as to why Plaintiff was perceived as a security threat and, accordingly, unable to possess a TWIC card.

170.    Because of this, without more materials, Plaintiff lacked the information necessary to properly challenge the TSA's determination on its merits.

171.    On March 1, 2018, in an effort to garner information so that Plaintiff could meaningfully respond to the bases for the TWIC card denial (and prepare a defense as to the finding that he was somehow a security threat), Plaintiff sought discovery as part of the ALJ process.

172.    The TSA opposed the request for any discovery, stating in part that since an ALJ reviews the classified information and SSI, and because Plaintiff received an unclassified summary page, Plaintiff could contest the information presented and the ALJ would have "sufficient information

to review and upon which to base a decision."

173.   On March 15, 2018, in another effort to garner information so that Plaintiff could meaningfully respond to the bases for the TWIC card denial (and prepare a defense as to the finding he was a security threat), Plaintiff requested that he, or at least his counsel, be permitted to appear at the classified portion of the hearing.

174.   The classified portion of the bifurcated hearing in these matters requires "SECRET" security clearance.

175.   Plaintiff's counsel communicated that Mr. Charles D. Swift, one of Plaintiff's attorneys, already has clearance at the SECRET level.

176.   Despite Mr. Swift already holding the appropriate clearance and Plaintiff's arguments supporting his request for either he or at least his counsel to appear at the classified portion of the hearing, including but not limited to being able to know the claims of the opposing party so that he could adequately prepare a meaningful defense, the TSA opposed this request and stated, in part, that withholding classified information and SSI would not inherently represent a violation of due process, and was necessary for national security.

177.   In a prehearing conference on May 15, 2018, the ALJ ruled on Plaintiff's requests.

178.   The ALJ later wrote his rulings in an Order Memorializing the Prehearing Conference.

179.   The ALJ ultimately ruled that the relevant SSI was inextricably intertwined with the classified materials, and therefore, while recognizing Plaintiff's right to the SSI, denied the request for it to be disclosed to him.  The ALJ also denied his motion seeking discovery.

180.   The ALJ ruled that although one of Plaintiff's counsel already had a SECRET clearance, the TSA's regulations are clear and provided no room for discretion by the ALJ; Plaintiff's request for either he or his counsel to be permitted to appear at the classified portion of the hearing was

therefore denied as well.

181.    On May 22, 2018, the TSA requested a 30-day continuance of the hearings in this matter (which were scheduled for no more than 7 and 8 days from the date of the request), in order to "consider new information that has come to the Agency's attention."

182.    In its request for a continuance, the TSA also requested an *ex parte* telephonic pre-hearing conference with the ALJ to "further explain" the Agency's request for a continuance in that matter.

183.    On May 24, 2018, the ALJ granted in part and denied in part the TSA's request, saying that the unclassified portion of the hearing was continued until a later date, but that the classified portion would commence at the date and time already set.

184.    On May 25, 2018, the TSA withdrew its Final Determination of TWIC Eligibility, and informed Plaintiff that he was "eligible to hold a TWIC," and accordingly, that he was no longer considered a threat.

185.    Plaintiff finally received his TWIC card on June 14, 2018, two and a half years after he first applied for it, and only after the TSA reconsidered on the eve of his unclassified administrative hearing and determined that Plaintiff was not, in fact, a security threat after all.

186.    Plaintiff is currently a truck driver, and intends to renew his TWIC card upon its expiration so that he can continue to practice his chosen profession.

187.    Though Plaintiff did ultimately receive a TWIC card, he lost income and opportunities during the interim time of over two years in which he fought the original denial.

188.    Plaintiff has filed an administrative claim under the Federal Tort Claims Act (hereinafter "FTCA") seeking damages, which remains pending.

189.    Plaintiff now seeks a ruling that Defendants' regulations and policies, which led to this unjustified and extensive delay, are arbitrary and capricious, and prejudiced Plaintiff by denying

him due process of law, as well as damages as appropriate for his injuries.[22]

## V.  CAUSE OF ACTION

**A.    COUNTS ONE & TWO:**

### Violations of the Fifth Amendment of the U.S. Constitution
### (Against Defendants McAleenan, Barr, Pekoske, Wray, and Kable)

190.    Plaintiff incorporates by reference the foregoing numbered paragraphs.

191.    Defendants McAleenan, Barr, Pekoske, Wray, and Kable, in their official capacities, deprived Plaintiff of his constitutional rights by violating the Due Process Clause of the Fifth Amendment.

192.    Plaintiff properly raises this claim as an interested party, who has been directly and personally affected by the regulations at issue, and whose denial of a TWIC card for purportedly posing a security risk for over two and a half years, without the ability to properly confront the evidence against him, denied him and continues to deny others similarly situated to Plaintiff constitutionally guaranteed due process.

193.    In addition, Plaintiff intends to renew his TWIC card upon its expiration (which is estimated in the spring or summer of 2023), and any future TWIC card denial without the ability to properly confront the evidence against him in the existing regulatory scheme would once again deny Plaintiff constitutionally guaranteed due process.

### i.  *Count One: Procedural Due Process*

194.    Procedural due process imposes constraints on governmental decisions depriving individuals of "liberty" or "property" interests, within the meaning of the Due Process Clauses of the Fifth of Fourteenth Amendments.

---

[22] Plaintiff intends to amend this Complaint at the appropriate time to add his claims under the FTCA.

195. Workers' identification credentials, such as TWIC cards, are among those property interests protected under the Due Process Clause.

196. Plaintiff, and other similarly situated individuals, have a protected property interest in the issuance of a TWIC card.[23]

197. One of the liberty interests protected under the Constitution is the right to "follow a chosen profession free from unreasonable governmental interference."[24]

198. In fact, restrictions on the freedom to practice chosen professions are among the deprivations the Due Process Clause was designed to protect against, as the right to engage in any common occupation is a protected liberty interest under the Constitution.[25]

199. Interests in reputation are also important recognized liberty interests under the Due Process Clause.

200. Procedural Due Process violations may occur under the stigma-plus doctrine "when the government takes certain adverse actions and those actions foreclose [a person's] freedom to pursue a chosen profession."

201. The stigma-plus doctrine may also be violated when government action injures an individual Plaintiff's reputation and deprives an individual of rights previously held under state law.

202. When statements or actions "might seriously damage [the Plaintiff's] standing and associations in [their] community," it is sufficiently stigmatizing for the purpose of a stigma-plus

---

[23] *Parker v. Lester*, 227 F.2d 708, 713-14 (9th Cir. 1955).

[24] *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 538 (D.C. Cir. 2015) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)).

[25] *Parker v. Lester*, 227 F.2d 708, 713-14 (9th Cir. 1955) (holding that, much like in the instant case, several seamen who were denied access cards were denied due process and were improperly denied "their right to earn a livelihood" in a common occupation).

analysis.[26]

203.     Stigma-plus claim are also present "when the government takes certain adverse actions and those actions create 'a stigma or other disability that foreclosed the plaintiff's freedom to take advantage of other employment opportunities.'"[27]

204.     The actions and communications of the Defendants injured Plaintiff's standing in the community as to shipping company officials who work in Plaintiff's chosen field of employment.

205.     These actions and communications by Defendants additionally gave the shipping company officials reason to believe that Plaintiff is dangerous or has, or is suspected of having, ties to terrorism.

206.     The Defendants' actions and communications were false because they impute criminal offenses or associations by Plaintiff.

207.     These actions and communications by Defendants also create the impression that Plaintiff has committed or will be charged with a crime.

208.     These actions and communications of Defendants created an alteration of the Plaintiff's right to procure a workers' identification credential and his historically protected right to engage in his chosen profession.  Similar recognized alterations in status include the revocation of driver's licenses[28] and defamation upon termination of employment.[29]

209.     These actions and communications resulted in Plaintiff being prohibited from engaging in his chosen employment for over two and a half years, as the TWIC card is a requirement for his chosen career and jobs like the one he was otherwise cleared to begin with the shipping company.

---

[26] *Vanelli v. Reynolds Sch. Dist. No. 7,* 667 F.2d 773, 777 n.5 (9th Cir. 1982).
[27] *Campbell v. Dist. Of Columbia*, 894 F.3d 281, 284 (quoting *Bd. Of Regents v. Roth*, 408 U.S. 564, 566 (1972)).
[28] *Paul v. Davis,* 424 U.S. 693, 711 (1976).
[29] *Guttman v. Khalsa,* 669 F.3d 1101, 1125 (10th Cir. 2004).

210.    Defendants' adverse actions directly foreclosed Plaintiffs' freedom to take advantage of chosen employment opportunities.

211.    Defendants' official action in the form of refusing to provide Plaintiff a TWIC card for over two and a half years, without providing Plaintiff a meaningful opportunity to rebut the allegations against him that he is a security risk, created a continuing stigma or disability that precluded Plaintiff's right to work in his chosen profession.

212.    Defendants stigmatized Plaintiff, injured his reputation, affected his standing in the community, deprived Plaintiff of a right previously guaranteed to him under state law, and foreclosed Plaintiffs' freedom to take advantage of employment opportunities. Therefore, Defendants violated the stigma-plus doctrine.

213.    The fundamental requirement of due process is that a person who is deprived of any right, including a protected property right, shall be afforded notice of the deprivation in advance, and an opportunity to be heard. [30]

214.    Federal courts have long observed that the core of natural justice rests in the right to hear the other side.

215.    The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and an opportunity to refute them.

216.    The right to submit argument implies that opportunity; otherwise, that right loses the core of its important meaning.

217.    The government is obligated to give timely notice to a person who possesses a protected interest and may be deprived of it, which must include substantive reasons that are sufficient to permit a meaningful response.

---

[30] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Parker*, 227 F.2d at 716.

218.   The government must provide any material and information, exculpatory or inculpatory, in its possession that is necessary for a meaningful response.

219.   As to the hearing provided, the TSA's regulations grant the TSA's chosen ALJ the authority to decide whether a person will even have a hearing, leaving this to the discretion of the ALJ.

220.   When a hearing is provided, as in Plaintiff's administrative appeal through the only process made available to him, the TSA's self-promulgated regulations require a separate hearing for any classified or SSI material.

221.   The regulations promulgated by the TSA, under the umbrella of DHS, failed to provide meaningful and sufficient due process to Plaintiff.

222.   The regulations utilized by the TSA prohibit applicants or their counsel from reviewing any classified material or SSI against them, or attending any classified hearings which directly pertain to adjudicating their appeals.

223.   The regulations permit the ALJ to make a decision based on information which is not provided to the TWIC card applicant, or his counsel.

224.   The regulations permit the ALJ to rely on that undisclosed information, without allowing the TWIC card applicant a meaningful opportunity to respond or even know the allegations against him or her.

225.   TWIC applicants such as Plaintiff have a constitutionally protected due process right to observe, evaluate, and contest all information used by the government when denying TWIC applications.

226.   At the very least, TWIC applicants possess a constitutionally protected right to have counsel present to review classified and/or SSI information on their behalf.

227.    At the very least, TWIC applicants possess a constitutionally protected right to have counsel attend classified hearings on their behalf.

228.    Neither Congress nor the President has granted the TSA or DHS the right to vest such broad authority in an ALJ.

229.    The unclassified hearing, as it lacks any real notice as to the classified and SSI information against Plaintiff because the materials provided to him in advance did not present reasons that would substantiate his being deemed a security threat, was therefore meaningless for Plaintiff.[31]

230.    As stated above, Plaintiff has a protected property interest in following a chosen profession, free from unreasonable governmental interference under the Fifth Amendment.

231.    The denial of Plaintiff's TWIC card application triggered his protected property interest. Plaintiff was offered a job at a shipping company as a truck driver, and the only reason Plaintiff could not take this job was because his TWIC card application was denied.

232.    Therefore, his interest in the truck driving job was not a unilateral expectation.

233.    Plaintiff was legitimately entitled to the job he was offered.

234.    At the time of denial, and for years afterward, none of the notices Plaintiff received contains factual reasons, or exculpatory or inculpatory information, as to why he was deemed a security threat; therefore, Plaintiff could not respond to the notices meaningfully.

235.    The notices which Plaintiff did receive from the TSA were neither timely nor meaningful.

236.    The materials Defendants withheld would have significant probative value in ensuring that

---

[31] *Boudin v. Dulles*, 136 F. Supp. 218, 221 (D.D.C. 1955) (finding proceedings challenging a decision by the Board of Passport Appeals improper, when applying preponderance of the evidence as the standard, when "there can be no dispute that confidential information was employed; that files were not revealed; and that evidence contained therein could not be, and was not, subject to cross-examination" because, under such circumstances, "any hearing provided an applicant becomes an empty gesture").

individuals are not erroneously deprived of their constitutionally protected interests.

237.    Plaintiff, and similarly situated individuals, are entitled to an adequate legal mechanism that affords them adequate notice and a meaningful opportunity to contest the deprivation of constitutionally protected rights.

238.    Plaintiff was entitled to know the charges against him so he could have rebutted them and corrected errors, as are individuals similarly situated to Plaintiff.

239.    To this day, Plaintiff remains wholly unaware of the nature of the TSA's claims which denied him a TWIC card for over two and a half years.

240.    Defendants' actions in this regard damaged Plaintiff's reputation and precluded him from practicing his chosen profession for over two and a half years.

241.    Defendants therefore violated Plaintiff's right to procedural due process of law.

### ii.  Count Two: Substantive Due Process

242.    In contrast to the procedural component of the Due Process Clause, substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them."[32]

243.    Substantive due process provides heightened protection against government interference.

244.    As stated above, an individual placed on a Terrorist Watchlist does not receive any notice of placement on the list, pre-deprivation or post-deprivation, or the reasons for this placement.

245.    Further, an individual's inclusion on a Terrorist Watchlist and the dissemination of that list are accomplished without any judicial involvement or review, and according to a standard of proof that is far lower than that typically required when deprivation of significant constitutional liberties is implicated.

---

[32] *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

246.     While the government has a compelling interest in maintaining a Terrorist Watchlist for national security reasons, citizens have a countervailing liberty interest in a meaningful opportunity to challenge placement on these lists.

247.     A citizen's liberty interest in engaging in common occupations is fundamental.[33]

248.     Upon information and belief, Plaintiff was placed on the Terrorist Watchlist before or during the pendency of his TWIC application.

249.     Defendants cannot demonstrate that there is no less restrictive means beyond reliance on a Terrorist Watchlist, without notice and a right to be heard challenging placement on a Terrorist Watchlist, by which to achieve a compelling interest, when evaluating applicants for TWIC cards.

250.     Defendant DHS violated Plaintiff's substantive due process rights because the regulations permit reliance on placement on a Terrorist Watchlist to disqualify a person from obtaining a TWIC card.

251.     Consulting the lists maintained by Defendants in determining whether an individual is a threat, and accordingly suspending the individual's application, is a practice that in itself lacks substantive due process protections, as those individuals, too, lack any pre-deprivation hearings.

252.     Defendants refused to separate the information Plaintiff, or even his counsel with security clearance, is entitled to review in order to rebut the charges against him, by merely concluding the information is "inexplicably intertwined" with classified data.

253.     Merely stating that Plaintiff is a threat, without articulating the underlying reasons for that label, shows that the government did not meet its burden when it took actions which deprived Plaintiff of his protected interests.

---

[33] *Parker*, 227 F.2d at 721 ("It should be noted that the rights of the individual here considered are also fundamental").

254.    Defendant TSA violated Plaintiff's substantive due process rights when, on information and belief, the TSA relied on Plaintiff's placement on a Terrorist Watchlist to deny Plaintiff a TWIC card.

255.    None of the Defendants can demonstrate that there is no less restrictive means by which to achieve any compelling interests without disregarding Plaintiff's due process rights.

256.    Plaintiff has therefore been deprived of his protected liberty interests, without adequate substantive due process.

**B.    COUNT THREE**

**Defendants Have Violated the Administrative Procedure Act**
**(Against Defendants McAleenan, Barr, Pekoske, Wray, and Kable)**

257.    Plaintiff incorporates by reference the foregoing numbered paragraphs.

258.    Defendants violated the Administrative Procedure Act ("APA") because Defendants' regulations and conclusions are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and further violated Plaintiff's constitutional rights.[34]

259.    Defendants violated the APA because, upon information and belief, the regulations used and approved by Defendants disqualified Plaintiff from obtaining a TWIC card based on his unjustified placement on a Terrorist Watchlist.

260.    The relevant regulations improperly give the ALJ the authority to decide whether a hearing is even warranted for a person whose TWIC card application is denied after being deemed a security threat.  Congress did not give DHS or the TSA the authority to award this broad discretion to an ALJ.

261.    Without authorization from the President or Congress, the government is forbidden from

---

[34] 5 U.S.C. §§ 702, 706 (2012).

promulgating regulations which bypass the traditional procedural safeguards of confrontation and cross-examination during a hearing.  Furthermore, a sweeping assertion of "national security," alone, is not sufficient for the government to deny traditional procedural safeguards to its citizens.[35]

262.   The TSA failed to follow its own protocol in adjudicating Plaintiff's application for a TWIC card.

263.   The TSA and the FBI held a multi-agency interview with Plaintiff, and requested documents and information that were unrelated to his application.

264.   These actions are outside the scope of the TSA's own regulations for applicants seeking a TWIC card.

265.   As stated above, Congress amended the MTSA in 2010 to specifically include provisions requiring that the Agency "shall" respond, "to the greatest extent practicable," within thirty days of the initial application, then within thirty days of any appeals, and any additional information provided.[36]

266.   Defendants DHS and TSA failed to comply with the timeliness provisions of the 2010 amendments to the MTSA.

267.   The TSA's self-promulgated regulations allow the TSA to grant itself extensions of time for good cause, which the TSA itself evaluates, and the regulations do not provide any limits as to how many days or how many times the TSA can grant itself an extension.

268.   Further, the regulations do not define the meaning of "good cause."

269.   The regulations therefore allow the TSA to indefinitely delay notice to affected applicants,

---

[35] *Parker*, 227 F.2d at 718-21.
[36] 46 U.S.C. § 70105(p) (as amended, 2010).

as the TSA did to Plaintiff for over two years in total.

270.    Upon information and belief, Defendants placed Plaintiff on a Terrorist Watchlist without providing Plaintiff proper notice or an opportunity to be heard, either in advance of this placement or at the time of deprivation.

271.    Upon information and belief, Defendants withheld a TWIC card from Plaintiff based on his placement on a Terrorist Watchlist.

272.    Even if Defendants did not place Plaintiff on a Terrorist Watchlist, Defendants' erroneous deprived Plaintiff of a TWIC card for over two years in violation of the APA, by not providing him the reasons for the denial or a meaningful opportunity to be heard.

273.    Plaintiff suffered damages as a result of these violations by Defendants, including but not limited to lost wages.

274.    Defendants violated the APA, and Plaintiff seeks relief accordingly.

275.    As stated above, this Court has jurisdiction to hear these claims, because Plaintiff's claims include constitutional claims as well as systemic challenges to the relevant regulations.

## C.    <u>COUNT FOUR</u>

### **Defendant Vicencia Violated Section 1981 of the Civil Rights Act of 1866**

276.    Plaintiff incorporates by reference the foregoing numbered paragraphs.

277.    Under the Civil Rights Act of 1866 (42 U.S.C. § 1981), all persons within the jurisdiction of the United States are entitled to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

278.    Furthermore, under 42 U.S.C. § 1981, all persons are protected from impairment of the right to make and enforce contracts.

279.    In the alternative and to the extent the actions of Agent Vicencia are not deemed to be

authorized or within the scope of his official duties, Defendant Vicencia is liable under Section 1981 because, upon information and belief, Defendant Vicencia improperly caused Plaintiff to be placed on a Terrorist Watchlist, or to remain unnecessarily on a Terrorist Watchlist, after learning he did not present a security threat.

280.    Defendant Vicencia further directly interfered with Plaintiff's pending offer of employment by intervening beyond the scope of his duties and making sure Plaintiff would not receive a TWIC card as required for his pending contingent job offer.

281.    Defendant Vicencia did so with the knowledge that placement on a Terrorist Watchlist would deny Plaintiff access to a TWIC card, and therefore deny him the employment he sought.

282.    Upon information and belief, Defendant Vicencia went outside of the scope of his job and authority, and acted in retribution by encouraging Defendants to place Plaintiff on a Watchlist, after Plaintiff refused to act as an informant for him.

283.    Upon information and belief, Defendant Vicencia went outside of the scope of his job and authority, and acted in retribution by encouraging Defendants deny Plaintiff's TWIC card application, after Plaintiff refused to act as an informant for him.

284.    Defendant Vicencia interfered with Plaintiff's contingent job offer even if he did not place Plaintiff on a Watchlist by preventing him from receiving a TWIC card.

285.    Defendant Vicencia unlawfully interfered with Plaintiff's valid employment offer from the shipping company, due to discriminatory animus, based on Plaintiff's national origin.

286.    Defendant Vicencia therefore unlawfully interfered with and violated Plaintiff's contractual rights to employment, in violation of 42 U.S.C. § 1981.

287.    Plaintiff seeks both compensatory and punitive damages for Defendant Vicencia's actions.

**D.     COUNT FIVE:**

**Attorneys' Fees under the Equal Access to Justice Act Against All Defendants**

288.    Plaintiff hereby alleges and incorporates by reference all numbered paragraphs above.

289.    The Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412 (hereinafter "the EAJA"), provides for the award of costs and attorneys' fees to a prevailing party in litigation against the United States or one of its agencies.

290.    Plaintiff respectfully requests that this Court grant EAJA costs and fees as provided for by statute.

## VI.     PRAYER FOR RELIEF

Plaintiff prays for judgment of liability against Defendants, and respectfully requests that this Court grant the following relief:

1) Declare that official capacity Defendants violated Plaintiff's rights to procedural due process under the Fifth Amendment to the U.S. Constitution;

2) Declare that official capacity Defendants violated Plaintiff's rights to substantive due process under the Fifth Amendment to the U.S. Constitution;

3) Declare that official capacity Defendants' actions against Plaintiff constitute an abuse of discretion and, accordingly, violate the APA;

4) Declare that the official capacity Defendants' actions against Plaintiff were arbitrary and capricious and, accordingly, violated the APA;

5) Declare that the official capacity Defendants' policies, practices, and customs, violate the APA and Constitution, and fail to allow for a meaningful opportunity for persons like Plaintiff to be heard;

6) Order the DHS and the TSA to revise its policies to provide TWIC card applicants a

meaningful opportunity to challenge application denials or TWIC card revocations;

7) Compensatory damages in an amount to be proven at trial against all Defendants where appropriate, including lost wages;

8) Nominal damages against all Defendants, where appropriate;

9) Punitive damages in an amount to be proven at trial against Defendant Vicencia;

10) All costs and expenses herein, against all Defendants;

11) Award Plaintiffs' attorneys' fees and costs as provided by any applicable provision of the law, against all Defendants;

12) Any additional and further relief this Court deems just, proper, and equitable.

Respectfully submitted this <u>20th</u> day of September, 2019.

*<u>/s/ Christina A. Jump</u>*
*<u>/s/ Charles D. Swift</u>*
*<u>/s/ Leila E. Mustafa</u>*
Christina A. Jump
D.C. ID No. TX151
Charles D. Swift
D.C. ID No. 987353
Leila E. Mustafa
D.C. ID No. TX169
833 E. Arapaho Rd.,
Suite 102
Richardson, TX 75081
Tel: (972) 914-2507
Fax: (972) 692-7454
cjump@clcma.org
cswift@clcma.org
lmustafa@clcma.org
*Counsel for Plaintiff*

## VERIFICATION OF COMPLAINT

I, Mohamed Al Seraji, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this <u>16th</u> day of <u>September, 2019</u>.